ORDER OF RAILWAY CONDUCTORS OF AMERICA et al. v. SWAN et al. WILLIAMS et al. v. SAME.

Nos. 8714, 8715.

Circuit Court of Appeals, Seventh Circuit. Dec. 21, 1945.

**326**

V. C. Shuttleworth and H. E. Wilmarth, both of Cedar Rapids, Iowa, W. A. Endle, General Offices, Order of Ry. Conductors, of Cleveland, Ohio, and Everett L. Gordon and Leo J. Hassenauer, both of Chicago, Ill., for appellants.

Anan Raymond, Conrad H. Poppenhusen and R. Z. Hickman, all of Chicago, Ill. (Poppenhusen, Johnston, Thompson & Raymond, of Chicago, Ill., of counsel), for intervenor-appellee.

Kenneth F. Burgess, Douglas F. Smith, and Robert Diller, all of Chicago, Ill., R. J. Hagman and Hallan Huffman, both of St. Paul, Minn., Bryce L. Hamilton, of Chicago, Ill., Burton Mason, of San Francisco, Cal., and John A. Sheean, of Chicago, Ill. (Sidley, Austin, Burgess & Harper, and Winston, Strawn & Shaw, all of Chicago, Ill., of counsel), for defendants-appellees.

Before EVANS, SPARKS, and KERNER, Circuit Judges.

SPARKS, Circuit Judge.

Plaintiffs instituted this action under general federal equity jurisdiction, for a declaratory judgment pursuant to § 274d (1) of the Judicial Code, 28 U.S.C.A. § 400(1). They sought to have the First Division of the National Railroad Adjustment Board declared to have exclusive jurisdiction of disputes involving railroad yardmasters, within the terms and definitions of § 3, subd. First (h) of the Railway Labor Act of May 20, 1926, as amended June 21, 1934. This Act created the

National Railroad Adjustment Board for the adjustment of disputes between the carriers and their employees. It consists of thirty-six members, grouped in four divisions, and the Act provides that the proceedings of each division shall be independent. The constituency and jurisdiction of each division are fixed by the statute. 45 U.S.C.A. § 153, subd. First (h). Only the first and fourth divisions are involved here.[1]

The only issue here involved is whether yardmasters shall be included in the first or fourth division. It is admitted that they can not be classified properly in either the second or third division, and if they can not be included in the first they must be included in the fourth division. The District Court held that they could not be classified properly in the first division, and assigned them to the fourth division. From that decree this appeal is prosecuted.

The decisive question here is whether yardmasters are "yard-service employees" as that term is used in the first division. Findings 7 to 13 inclusive are supported by substantial evidence and are as follows:

7. "Yardmasters and assistant yardmasters are not train-service or yard-service employees of rail carriers; that is to say, they are not engineers, firemen, hostlers, outside hostler helpers, conductors, trainmen, or yard-service employees.

8. "The terms 'yard service' and 'yard-service employees' are not terms in general and common usage in the English language.

9. "The terms 'yard service' and 'yard-service employees' are and have been for many years, both prior and subsequent to the amendment of the Railway Labor Act in 1934, technical terms in railroad usage, with definite meanings clearly understood by persons familiar with that usage.

10. "The term 'yard-service employees,' as used in Section 3, First (h) of the Railway Labor Act with reference to the jurisdiction of the First Division of the National Railroad Adjustment Board, was taken by Congress from railroad usage and

[1] "First Division: To have jurisdiction over disputes involving train- and yard-service employees of carriers; that is, engineers, firemen, hostlers, and outside hostler helpers, conductors, trainmen, and yard-service employees. * * *"

"Fourth Division: To have jurisdiction over disputes involving employees of carriers directly or indirectly engaged in transportation of passengers or property by water, and all other employees of carriers over which jurisdiction is not given to the first, second, and third divisions. * * *"

was introduced into the said statute upon its amendment in 1934 as a railroad term having the meaning customarily assigned to it in railroad parlance.

11. "At the time of the amendment to the Railway Labor Act referred to in the preceding paragraph 10, for many years prior thereto, and since that time, the term 'yard-service employees' referred, and has referred, solely to railroad employees engaged in making up and breaking up trains and switching trains and cars within yard limits. Over the same period of time the term 'yard service' has denoted the work performed by such employees, who include engineers, firemen, conductors or engine foremen, yard brakemen or switchmen, and switchtenders.

12. "During the period of time referred to in the preceding paragraph 11, the terms 'yard service' and 'yard work' have been synonymous and have been used interchangeably in railroad parlance, and the terms 'yard-service employees' and 'yard men' have been synonymous and used interchangeably in railroad parlance.

13. "Railroad usage, as evidenced by the testimony of experienced railroad officials and representatives of railroad employees, has never included yardmasters and assistant yardmasters within the meaning of the terms 'yard-service employees' or 'yard men,' and yardmasters and assistant yardmasters have never been regarded as yard-service employees or yard men."

 A study of this record convinces us that the District Court, in holding that yardmasters were not included in Division 1, did not give to the Act a strained or narrow interpretation contrary to the meaning of its terms. In support of their contention to the contrary, plaintiffs rely on Federal Trade Commission v. Bunte Brothers, Inc., 312 U.S. 349, 61 S.Ct. 580, 85 L.Ed. 881, and United States v. Cooper Corporation, 312 U.S. 600, 61 S.Ct. 742, 85 L.Ed. 1071. In both of those cases the court declined to extend the terms there used beyond their natural and ordinary meaning, and that is precisely the thing that was done in the case at bar. The testimony of all the witnesses did not differ materially with respect to the definition of "yard-service employees" as used by those engaged in the railroad business, and the court's finding adopted that definition. True, plaintiffs' one witness stated: "I would say that they (yardmasters) fit more nearly in with the yard-service employees

than with any other class." However, he did not deny the accuracy of the definition of the terms "yard-service employees" as given by all other witnesses testifying on this subject. Of course, the construction of a statute involves a question of law. However, the definitions of words, either common or technical, involve questions of fact, and we are bound by the court's findings as to the definitions if they are supported by substantial evidence.

Aside from the testimony of witnesses on this subject, plaintiffs contend that the court erred in failing to give any weight to the historical alignment of yardmasters with the train and yard-service crafts in the settlement of disputes before boards of adjustment.

During the period of federal control of railroads (1918-1920), the basis of Railway Board of Adjustment No. 1, was an agreement between the regional directors of the railroads, and representatives of four labor organizations of railway conductors, railroad trainmen, locomotive engineers, and locomotive firemen and enginemen. A similar agreement was made by the regional directors and representatives of six labor organizations of shop employees, and this constituted the basis for Board of Adjustment No. 2. A like agreement was made with four labor organizations: Switchmen, Railroad Telegraphers, Railway Clerks, and Maintenance-of-way employees, which was the basis for Board of Adjustment No. 3. The jurisdiction of each board was to adjust personal grievances or controversies arising under interpretation of wage agreements, and all other disputes arising between officials of the railroad and its employees, covered by the several respective agreements. Thus no provision was made for submission of disputes of employees who did not belong to one of the organizations named in the agreements. However, provision for adjustment of the disputes of such employees was made by Circular No. 3 of the Division of Labor of the United States Railroad Administration, which contained the following paragraph:

"(c) When employees are represented by Railway Boards of Adjustment, the procedure as to all controversy within the scope of their duties will be as directed in general orders creating such boards. The fact that certain employees are not represented by Railway Boards of Adjustment will in no manner deprive them of any of

the benefits accruing from such boards. An assistant to the Director * * * has been appointed, and a staff of representatives has been organized, for the * * * purpose of rendering the same service to such employees as though represented by a Railway Board of Adjustment. * * *"

This circular further provided for the method of handling requests for adjustments in wages by employees not represented by Railway Boards of Adjustment and personal grievances or controversies arising under the interpretation of wage agreements and all other disputes arising between officials of a railroad and its employees not represented by Railway Boards of Adjustment. If not settled on the property, such disputes were referable to the Director of the Division of Labor of the United States Railroad Administration.

During this period the disputes of yardmasters were referable to no less than three separate adjustment bodies, national in scope. If a yardmaster belonged to one of the four brotherhoods represented on Board No. 1, he went to that Board; if he belonged to the Switchmen's Union, he went to Board No. 3; but if he belonged to an organization not represented on one of the three boards, or to no labor organization, he went to a special staff in the Division of Labor.

Jurisdiction to hear and decide all disputes during this period, those of yardmasters, yard-service employees, and all other employees, depended not upon a classification according to crafts or jobs, as it does now, but upon labor representation.

The Transportation Act of 1920, 49 U.S. C.A. § 71 et seq., superseded the arrangements set up during the period of federal control. Under this Act, adjustment boards were authorized to be created by agreement. The jurisdiction of such boards extended only to the disputes of employees represented on that board. Neither the Switchmen's Union, nor the Railroad Yardmasters of America were parties to any of those agreements and if any of their disputes were heard by those boards it was due solely to the fact that such member or members happened to hold membership in the signatory labor organizations, and such jurisdiction was not based on a classification of work or crafts, nor was it based on any administrative interpretation of the term "yard-service employees" as including yardmasters. The adjustment

jurisdiction of the Labor Board was confined neither to the disputes of specified crafts only, nor to the disputes of any particular labor organization. The Labor Board was directed to hear and decide any dispute involving grievances, rules, or working conditions on which an adjustment board had deadlocked, if the adjustment board certified the deadlock to the Labor Board. The Labor Board was also authorized to act on its own motion in case it determined that an adjustment board had deadlocked or failed to consider a dispute with due diligence, and it was authorized to handle disputes in the first instance in cases where an appropriate adjustment board had not been organized.

The Railway Labor Act of 1926 also directed that boards of adjustment should be created by agreement, and such agreement was required to specify the group or groups covered by the adjustment board.

That Act also authorized individual carriers and their employees to enter into adjustment agreements, and under this Act, boards previously established were continued, and the number of such boards was increased; under it, as under the previous Act, the only yardmasters' and yard-service employees' disputes heard by such adjustment boards were those of members of the four brotherhoods. Large numbers of yard-service employees, such as those belonging to the Switchmen's Union, were not subject to the jurisdiction of the Train Service Boards of Adjustment, because they had no membership in the signatory unions, and for the same reason only a few of the yardmasters were subject to that jurisdiction.

Under the Act of 1934, the jurisdiction of the Adjustment Board is not determined by representation or left to agreement; it is defined strictly in terms of disputes involving specified classes of employees, regardless of the labor affiliations of the members of the several classes. Under the present law, the several divisions of the National Adjustment Board were not created by signed agreement, but by statute which contains not a word to imply that the Order of Railway Conductors and the Brotherhood of Railroad Trainmen may, or that the members of the Railroad Yardmasters must submit their disputes to the First Division.

In view of these facts we think the District Court was correct in concluding that the historical alignment of yardmasters

with the train and yard-service crafts in the settlement of disputes is not helpful in determining the question now before us.

Plaintiffs further contend that the court erred in failing to give weight to the contemporaneous administrative interpretation of the Adjustment Board. In support of that contention they rely on nineteen decisions of that Board, only three of which, we think, relate to disputes involving yardmasters in the proper sense of that term. In one, a yardmaster complained of wrongful demotion to a yardman position; in another he complained of wrongful discharge; and in another he complained of wrongful displacement by another yardmaster, claiming rate of payment under one agreement rather than another. In none of these awards was there any discussion of the jurisdictional question depending upon the interpretation of "yard-service employees." The award merely recited, as in all awards: "This Division of the Adjustment Board has jurisdiction over the dispute involved herein."

Whenever the question involved in this case has been given specific attention, the First Division has deadlocked. The labor members wished to accept yardmaster cases, and carrier members refused. In the Fourth Division, except as we shall note, the carrier members favored taking yardmasters' cases, and the labor members objected, and this situation has existed for a considerable length of time, and for this reason the present suit was instituted.

■ The exception last above noted was a case in which a petition for mandamus was filed by the Railroad Yardmasters of America against members of the Fourth Division, and prayed that an order be entered commanding them to hear and determine certain disputes mentioned in the petition. Summons was issued, the defendants appeared and filed answer admitting they were members of the Fourth Division, and that they were of the opinion that said Division had jurisdiction of such disputes. The decree enjoined and commanded the Fourth Division to docket, order the determination and enter awards on three ex parte submissions involving yardmasters theretofore filed with the Fourth Division. That decree was entered by Judge Holly without argument and without information that there was a public question involved or that anyone aside from the parties had any interest in the

question then presented. It is noted here only for the reason that the Railroad Yardmasters of America, intervenor here, contends that the decree in that case is res adjudicata of the issues now presented, and asks that the decree now before us be affirmed. We think the District Court ruled correctly in holding it was not res adjudicata as to the issues now presented.

■ Under the facts related we are of opinion that the alleged contemporaneous administrative interpretation adds no weight to plaintiffs' contention. Administrative interpretation is resorted to only when the statute is ambiguous. United States v. Missouri Pacific R. Co., 278 U.S. 269, 49 S.Ct. 133, 73 L.Ed. 322; Koshland v. Helvering, 298 U.S. 441, 56 S.Ct. 767, 80 L.Ed. 1268. In cases where it is proper to consider, there must have been definite and unequivocal administrative action on a question of the type under consideration, and it must be authoritative in character, uniform, consistent, and long-continued. United States v. Missouri Pacific R. Co., supra; Higgins v. Commissioner, 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed. 783; Burnet v. Chicago Portrait Co., 285 U.S. 1, 52 S.Ct. 275, 76 L.Ed. 587; and Texas & Pacific Ry. Co. v. United States, 289 U.S. 627, 53 S.Ct. 768, 77 L.Ed. 1410. An administrative interpretation contrary to the plain meaning of the statute, though of long standing, is never accepted by the courts. Texas & Pacific Ry. Co. v. United States, supra; Koshland v. Helvering, supra; Estate of Sanford v. Commissioner, 308 U.S. 39, 60 S.Ct. 51, 84 L.Ed. 20; and City Bank Farmers' Trust Co. v. Helvering, 313 U.S. 121, 61 S.Ct. 896, 85 L. Ed. 1227.

■ Plaintiffs further contend that the trial court erred in failing to give weight to the failure of Congress to amend the Railway Labor Act. At two different times a bill was introduced into Congress to amend the Railway Labor Act in such manner as to exclude yardmasters' disputes from the jurisdiction of the First Division. Both bills went to the Committee and were never reported out. Whether their demise by that method was due to the fact that the Committee thought they were undesirable or unnecessary we are not informed, and no presumption arises as to the cause.

Decree affirmed.